# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JERRY BEWLEY, and DEBORAH BEWLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-00386-TWP-DML |
| | ) | |
| MATTHEW TURPIN, | ) | |
| SPEEDWAY POLICE DEPARTMENT, and | ) | |
| TOWN OF SPEEDWAY, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR LEAVE TO FILE SURREPLY AND SUPPLEMENTAL DESIGNATION OF EVIDENCE

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Matthew Turpin ("Officer Turpin"), the Speedway Police Department ("SPD"), and the Town of Speedway ("Speedway") (collectively, "Defendants") (Filing No. 46). Plaintiffs Jerry Bewley ("Mr. Bewley") and Deborah Bewley (collectively, "the Bewley's") raise claims under 42 U.S.C. § 1983 ("Section 1983") for excessive force in violation of the Fourth and Fourteenth Amendments and state law negligence claims. Filing No. 1-1 at 13-16. Also pending is Plaintiffs' Motion for Leave to File Surreply and Supplemental Designation of Evidence ("Motion for Leave to File Surreply and Supplemental Designation of Evidence (Filing No. 74). For the following reasons, the Bewleys' Motion for Leave to File Surreply is **granted in part and denied in part**, and Defendants' Motion for Summary Judgment is **granted in part** as to all federal claims against all Defendants and all state law claims against SPD and Officer Turpin, **and denied in part** as to all state law claims against Speedway. The Court further concludes that the remaining state law claims against Speedway should be **remanded** to state court.

## I.    <u>BACKGROUND</u>

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to the Bewleys as the non-moving parties.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

On the evening of March 1, 2019, SPD received a call from a concerned citizen reporting "suspicious activity" by unknown individuals and fearing a possible burglary ([Filing No. 47-2 at 1](), ¶ 2).  SPD dispatched several officers in response to the call, including Officer Turpin, who was accompanied by his SPD police dog, Tom ("Tom").  *Id.*  Tom had been Officer Turpin's canine partner and SPD's only police dog since 2013 ([Filing No. 48 at 3]()).

Around 7:30 p.m., just as it was getting dark, Officer Turpin identified what he described as a "suspicious vehicle," which suddenly drove off ([Filing No. 47-2 at 1](), ¶ 3). Officer Turpin pursued the vehicle.  During this pursuit, he learned from SPD dispatch that the vehicle had been reported as stolen.  *Id.*  Vehicular theft is a Level 6 felony under Indiana law.  Ind. Code § 35-43-4-2(a)(1); Fed. R. Evid. 702.

That same evening, Mr. Bewley was working as a part-time delivery driver for a local restaurant ([Filing No. 63 at 1]()). While Officer Turpin was pursuing the suspect, Mr. Bewley was nearby, making a delivery to a customer at 6127 Meadowood Drive ("6127 Meadowood"), in Speedway, Indiana.  *Id.*; ([Filing No. 47-1 at 8](); [Filing No. 47-2 at 2](), ¶ 4).  Mr. Bewley was at the customer's door completing the transaction when he heard police sirens.  ([Filing No. 48 at 1]()–2; [Filing No. 63 at 1]()–2.)  He then saw the suspect's vehicle driving south down Meadowood Drive, toward the customer's house.  *Id.*  The vehicle crashed into a parked car just down the street, north of 6127 Meadowood, and the vehicle's occupants got out and began running.  *Id.*  Mr. Bewley—fearing police might shoot at the suspects running toward him and that he would be caught in the

line of fire—crouched on the south side of a Jeep parked in the customer's driveway.  (Filing No. 47-1 at 14; Filing No. 48 at 2; Filing No. 63 at 2.) Although the customer offered to let Mr. Bewley come inside, Mr. Bewley felt uncomfortable entering a customer's home, so he stayed crouched behind the Jeep. (Filing No. 48 at 2; Filing No. 47-1 at 10.)  Mr. Bewley was wearing a dark jacket but was illuminated by a streetlight near 6127 Meadowood. (Filing No. 48 at 2.)

When he lifted his head to see what was happening, Mr. Bewley saw one of the suspects run east in between 6127 Meadowood and the neighboring house directly north, located at 6121 Meadowood Drive ("6121 Meadowood"). *Id.* at 2.  A few seconds later, Mr. Bewley saw Officer Turpin's patrol car pull up to 6127 Meadowood, with its lights on but siren off (Filing No. 47-1 at 12).  By then, the suspects had fled down the path between the two homes and out of view.  *Id.* at 14.[1]  When he saw the patrol car, Mr. Bewley stopped crouching and stood at full height, believing that because the suspects were now out of sight, there was no longer any risk police would shoot at them, and that he was safe.  *Id.* at 14.

Officer Turpin had seen the suspects flee in between 6127 and 6121 Meadowood, so he parked on the street just south of 6127 Meadowood's driveway (Filing No. 47-2 at 2, ¶ 5; Filing No. 47-1 at 13). Officer Turpin quickly exited his patrol car, immediately went to the back driver's side door, and, without looking for bystanders and without giving a warning, released Tom (Filing No. 63 at 2). Tom had been trained to and had demonstrated an ability to pursue specific individuals on command.  (Filing No. 47-2 at 3.)  Before March 1, 2019, Tom had bitten only

---

[1] Defendants argue it is unreasonable to infer that the suspects were out of sight by the time Officer Turpin deployed Tom because Mr. Bewley and Officer Turpin had different vantage points of the path down which the suspects fled (Filing No. 73 at 13).  The Court disagrees.  Mr. Bewley was able to see the speed and direction of the suspects as they ran past him (Filing No. 48 at 2).  Mr. Bewley also presented evidence that Officer Turpin was parked on the south side of 6127 Meadowood's driveway, the same side of the driveway Mr. Bewley was on, and therefore had a relatively similar vantage point (Filing No. 47-1 at 12).  It is therefore reasonable to infer that by the time Officer Turpin released Tom, the suspect had fled out of sight from Mr. Bewley, Officer Turpin, and Tom.

people Officer Turpin directed Tom to pursue and apprehend.  (Filing No. 48 at 3.)  But Officer

Turpin did not issue any commands to Tom when he released him, and instead of pursuing the

suspect, Tom ran straight toward Mr. Bewley.  *Id.* at 3.[2]

When Mr. Bewley saw Tom running toward him, he panicked and tried to climb onto the

hood of the Jeep for safety (Filing No. 63 at 2).  Officer Turpin did not see Mr. Bewley until Tom

started running toward him (Filing No. 48 at 2).  Before Mr. Bewley could climb completely on

the hood of the Jeep, Tom bit Mr. Bewley's right leg and held the bite for several seconds (Filing

No. 63 at 2). Officer Turpin verbally commanded Tom to release Mr. Bewley, but Tom did not

respond and needed to be pulled off of Mr. Bewley (Filing No. 47-1 at 8, 14). Officer Turpin

ceased his pursuit of the suspects to assist Mr. Bewley[3] (Filing No. 48 at 3). Paramedics arrived

and transported Mr. Bewley to the hospital.  He was discharged later that evening (Filing No. 47-

1 at 9).

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

[2] Officer Turpin disputes this version of events.  He contends he parked his patrol car at 6121 Meadowood (north of 6127 Meadowood), exited his patrol car and "quickly" looked for bystanders and shouted a warning before releasing Tom (Filing No. 47-2 at 2).  Officer Turpin also states he commanded Tom to apprehend the fleeing suspect after opening the rear driver's side door and saw Tom "lock-in" on and start running toward one of the suspects before running toward Mr. Bewley.  *Id.*  Based on Mr. Bewley's proximity to Officer Turpin and the natural and artificial lighting present during these events, it is reasonable to infer that these events transpired as Mr. Bewley described for purposes of summary judgment.  *See Shepherd v. Town of Merrillville, Ind.*, No. 12-CV-23, 2015 WL 999841, at *4 (N.D. Ind. Mar. 6, 2015) ("[A] reasonable inference from Plaintiff's testimony that he did not hear [the officer] tell him he was under arrest is that [the officer] never said it.").

[3] Defendants state that the fleeing suspect that Officer Turpin had intended for Tom to apprehend, Javonte Thornton ("Mr. Thornton"), was later charged with two Level 6 felonies and three misdemeanors, but Defendants do not offer evidence identifying the charges or whether during the pursuit Officer Turpin suspected Mr. Thornton of the charged crimes. Accordingly, the crimes for which Mr. Thornton was later charged are immaterial for purposes of summary judgment.

party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.   DISCUSSION

On January 20, 2020, Plaintiffs filed this action in state court alleging claims of excessive force under Section 1983, as well as state law negligence claims against Defendants (Filing No. 1-2). Defendants removed the case to federal court on February 4, 2020 (Filing No. 1-1).  In their Motion for Summary Judgment, Defendants argue that SPD is not a proper party to this action and

all claims against it should be dismissed.  Defendants also argue that the Section 1983 claims against Officer Turpin and Speedway should be dismissed because Mr. Bewley was not seized under the meaning of the Fourth Amendment, that Officer Turpin in entitled to qualified immunity, and that Speedway is not liable for Officer Turpin's conduct under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  Defendants further assert that the Bewleys have failed to state a claim against Officer Turpin under the ITCA and that Officer Turpin and Speedway are immunized against the Bewleys' state law claims under the ITCA.

In their response to Defendants' Motion for Summary Judgment (the "Response"), the Bewleys assert that in addition to violating Mr. Bewley's Fourth Amendment rights—which the Bewleys expressly alleged in the Complaint—Defendants violated Mr. Bewley's Fourteenth Amendment rights—a claim not articulated in the Complaint.  The Bewleys also designate an article published by *The Indianapolis Star* ("the IndyStar Article") and two reports by their expert witness, Robert H. Brandau ("Mr. Brandau") (Filing No. 62-2; Filing No. 62-3; Filing No. 62-4).

In their reply brief (the "Reply"), Defendants argue that the Bewleys failed to plead or have waived a Fourteenth Amendment claim, that the IndyStar Article is inadmissible hearsay and irrelevant (Filing No. 73 at 2–3), and that Mr. Brandau's reports are inadmissible because the reports are unsworn and unreliable.  *Id.* at 2–11.

The Bewleys have since filed a Motion for Leave to File Surreply (Filing No. 74).  The Bewleys' proposed surreply responds to arguments in Defendants' Reply regarding the admissibility of the IndyStar Article and Mr. Brandau's reports, (Filing No. 74-1 at 2–13), and designates an affidavit from Mr. Brandau as to his reports, (Filing No. 74-3).  The surreply also contains new arguments about Tom's diagnosis of cauda equina syndrome, (Filing No. 74-1 at 13–

6

16), and designates written discovery responses from Defendants dated October 7, 2021, and an article about cauda equine syndrome, (Filing No. 74-6; Filing No. 74-7; Filing No. 74-8).

The Court will first resolve the Bewleys' Motion for Leave to File Surreply and the issues of the admissibility of the IndyStar Article and Mr. Brandau's reports raised in Defendants' Reply before addressing each of Defendants' arguments on the merits in turn.

**A.      The Bewleys' Motion for Leave to File Surreply**

The Bewleys ask the Court for leave to file a surreply brief in opposition to Defendants' summary judgment motion for two reasons. First, the Bewleys contend they are entitled to respond to Defendants' objections to the IndyStar Article and Mr. Brandau's reports, and the new evidence designated in support of those objections, (Filing No. 74 at 2, ¶¶ 5–12).  Second, they seek to discuss Tom's cauda equina syndrome diagnosis, which the Bewleys first learned of after filing their Response.  *Id.* at 3–4.  The Court will first address the Bewleys' request to respond to the evidentiary objections and designate Mr. Brandau's affidavit and will then address the "new evidence" regarding Tom's cauda equina syndrome diagnosis.

**1.      The IndyStar Article and Mr. Brandau's Reports**

In their Reply, Defendants object to the admissibility of the IndyStar Article and Mr. Brandau's reports and designated new evidence—Mr. Brandau's deposition transcript—in support of those objections.  Local Rule 56-1 grants the Bewleys an opportunity to respond to those objections and new evidence, (Filing No. 64 at 3).

The "purpose for having a motion, response and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, No. 09-cv-0340, 2010 WL 1258052, at *2 (S.D. Ind. Mar. 25, 2010).  However, "new arguments and evidence may not be raised for the first time in a reply brief.  Reply briefs are for

7

replying, not raising new arguments or arguments that could have been advanced in the opening brief." *Reis v. Robbins*, No. 14-cv-00063, 2015 WL 846526, at *2 (S.D. Ind. Feb. 26, 2015) (citations omitted). "[T]his serves to prevent the nonmoving party from being sandbagged." *Id.* (citation omitted). Courts allow a surreply only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response. *See, e.g.*, *id.*; *Miller v. Polaris Labs., LLC*, No. 11-cv-01004, 2014 U.S. Dist. LEXIS 18161, at *4–5 (S.D. Ind. Feb. 12, 2014). Local Rule 56-1 permits a party opposing summary judgment to "file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response."

Defendants concede that the Bewleys may file a surreply to respond to the objections to the IndyStar Article and Mr. Brandau's reports and new supporting evidence in the Reply ([Filing No. 77 at 2](#)). But Defendants oppose the Bewley's request to supplement their designated evidence with an affidavit from Mr. Brandau. *Id.* In their Reply, Defendants challenge the admissibility of Mr. Brandau's reports in part because the reports were unsworn. The Bewleys now seek to submit Mr. Brandau's affidavit verifying his reports.

Defendants note that the Local Rules do not permit parties to submit new evidence on surreply and that "all of Plaintiffs' evidence should [be] filed with the response brief." *Estate of Williams v. Ind. State Police*, 26 F. Supp. 3d 824, 838 (S.D. Ind. 2014). However, Local Rule 56-1(l) provides that "in the interest of justice or for good cause, [the Court may] excuse failure to comply strictly with [Local Rule 56-1]." Federal Rule of Civil Procedure 56(e) similarly provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . give an opportunity to properly support or address the fact."

This Court has regularly allowed parties to submit belated affidavits verifying previously designated evidence. *See Westfield Ins. Co. v. TCFI Bell SPE II LLC*, No. 16-cv-02269, 2019 WL 1330456, at *3 (S.D. Ind. Mar. 25, 2019) (granting leave to file affidavits supplementing previously-filed designated evidence); *Design Basics, LLC v. Kerstiens Home & Designs, Inc.*, No. 6-cv-00726, 2018 WL 1730735, at *3 (S.D. Ind. Apr. 10, 2018) (permitting non-movant to submit second amended declarations in opposition to summary judgment, which were identical to original and first amended declarations except for the jurats, which non-movant amended in response to objections by movant); *Vest v. Al-Shami*, No. 12-cv-00039, at *6 n.15 (S.D. Ind. Feb. 24, 2014) (considering on summary judgment non-movant's expert report originally designated without a sworn statement but corrected after non-movant was "granted [leave] to amend the exhibit to include [the expert's] sworn declaration"); *Harpold v. Ethicon Endo-Surgery, Inc.*, No. 06-cv-1666, 2009 WL 688984, at *1 (S.D. Mar. 11, 2009) ("The belated affidavit [from the expert] is sufficient to support the use of the report at the summary judgment stage.").

Accepting Mr. Brandau's belated affidavit would also serve the interest of justice, as courts generally prefer to base their decisions on the merits of a case, rather than mere technicalities. *See Foman v. Davis*, 371 U.S. 178, 181 (1962) ("It is . . . entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities."); *see also Woods v. Ind. Univ.-Purdue Univ.*, 996 F.2d 880, 884 (7th Cir. 1993) ("[D]ispositive decisions should be based on the merits rather than technicalities"); *Nigro v. Ind. Univ. Health Care Assocs., Inc.*, No. 19-cv-03936, 2021 WL 3913484, slip op. at 9 (S.D. Ind. Sept. 1, 2021); *Design Basics, LLC*, 2018 WL 1730735, at *3; *Ballard v. Wilderness Resort Hotel & Golf Resort*, No. 14 C 00841, 2014 WL 3811003, at *1, *2 n. 4 (N.D. Ill. Aug. 1, 2014) (determining that an affidavit that did not provide a date of execution as required by 28 U.S.C.

§ 1746 may be considered by the Court on a motion to remand because "'decisions on the merits are not to be avoided on the basis of mere technicalities'") (quoting *Schiavone v. Fortune*, 477 U.S. 21, 27 (1986))).

The designation of Mr. Brandau's affidavit will not prejudice Defendants because the same reports were filed with the Bewleys' Response and disclosed to Defendants during discovery before they filed their Reply.  Indeed, Defendants were able to take Mr. Brandau's deposition—during which Mr. Brandau discussed both of his reports under oath—before Defendants filed the Reply, which designates Mr. Brandau's deposition transcript.   Mr. Brandau's affidavit offers no substantive information—it merely authenticates his reports and swears to the information contained in them, (Filing No. 74-1 at 7).[4]  *See Nigro*, 2021 WL 3913484, slip op. at 10 (finding no prejudice to movant from submission of corrected affidavits because "the affidavits contain largely identical substantive information" and the movant's "reply brief addresse[d] the substance of the affidavits at length"); *Westfield Ins. Co.*, 2019 WL 1330456, at *3 (finding no prejudice to movant from submission of belated affidavits and "consider[ing] it important that [the movant] had the underlying designated evidence and was able to reply to that evidence and [the non-movant's] arguments, and the evidence could be presented in a form that would be admissible in evidence at trial").  Defendants had an opportunity to—and did—address their other objections to the admissibility of Brandau's reports in their Reply.

In the interest of justice and based on the Court's preference to decide cases on the merits rather than procedural oversights, the Bewleys' Motion for Leave to File Surreply is **granted in**

---

[4] The Bewleys assert arguments in support of their request to file a surreply and supplemental evidence in their proposed surreply brief, instead of in their Motion for Leave to File Surreply or a brief in support (Filing No. 74-1). Because those arguments speak to whether a surreply should be permitted and not whether summary judgment should be granted, the Court will consider those arguments as if made in the Motion for Leave to File Surreply.

**part** for purposes of responding to the evidence and arguments submitted by Defendants regarding the admissibility of the IndyStar Article and Mr. Brandau's reports and for purposes of designating Mr. Brandau's belated affidavit (Filing No. 74-1 at 1–13; Filing No. 74-3; Filing No. 74-4; Filing No. 74-5).

Defendants have requested an opportunity to respond to the Bewleys' surreply to the extent the Court decides to consider any of the "new evidence" submitted by the Bewleys. Although the Court is accepting Mr. Brandau's affidavit, Defendants have already fully briefed their opposition to Mr. Brandau's reports, an additional response is unnecessary so Defendants' request is **denied**.

### 2. Tom's Cauda Equina Syndrome Diagnosis

The Bewleys also ask for leave to submit new arguments and evidence regarding Tom's diagnosis of cauda equina syndrome, arguing that "this information is newly discovered and [was] not available at the time of their response brief," warranting an "equitable deviation" from Local Rule 56-1 (Filing No. 74 at 2–3). The Bewleys specifically seek to designate Defendants' October 7, 2021 responses to written discovery requests, veterinary records produced with those responses, and an article from the journal Acta Veterinaria Brno about cauda equina syndrome (the "Acta Veterinaria Brno Article").

Cauda equina syndrome is not discussed in Defendants' Reply or any of the summary judgment briefing, so the portions of the Bewleys' Surreply Brief and Supplemental Designation of Evidence related to cauda equina syndrome exceed the scope of a permissible surreply under Local Rule 56-1(d). *See U.S. ex rel. Abner v. Jewish Hosp. Health Care Servs.*, No. 05-cv-106, 2010 WL 811288, at *1 (S.D. Ind. 2010) ("Pursuant to Federal Rule of Civil Procedure 56(e), the party opposing a motion for summary judgment must, by affidavit or other evidence, set out specific facts showing a genuine issue for trial. The party is not entitled to hold back evidence until the filing of a surreply."); *see also Chaib v. GEO Group, Inc.*, 92 F. Supp. 3d 829, 835 (S.D. Ind.

2015) (striking a surreply that repeated arguments made in party's response brief and was not limited to new evidence and objections made on reply).

The Court is not persuaded by the Bewleys' argument that their noncompliance with Local Rule 56-1 should be excused because the cauda equina syndrome evidence was "not available" when the Bewleys filed their Response (Filing No. 74 at 4). Defendants filed their summary judgment motion on July 2, 2021 (Filing No. 46). The Bewleys filed two unopposed motions for additional time to file their Response (Filing No. 50; Filing No. 56), both of which were granted, (Filing No. 51; Filing No. 58), extending their filing deadline to September 13, 2021 (Filing No. 63). Almost three weeks later, on October 1, 2021, the Bewleys moved for leave to conduct limited additional discovery about whether Tom had been euthanized (Filing No. 66). The Bewleys stated that "[p]rior to the close of discovery, Plaintiffs had no reason to suspect that K-9 Officer Tom had been put down" but that "[c]onsidering the phrasing in the summary judgment filings, Plaintiffs now have reason to believe that K-9 Officer Tom may be deceased." *Id.* at 1. The Court granted the Bewleys leave to conduct the additional discovery on October 6, 2021 (Filing No. 69). The Bewleys served their written discovery requests the same day, and Defendants served responses the next day, on October 7, 2021 (Filing No. 74-6; Filing No. 74-7).

The Bewleys could have obtained the new cauda equina syndrome evidence well before filing their Response. According to their motion requesting leave to conduct additional discovery, the Bewleys identified information regarding Tom's death as potentially relevant when Defendants filed their summary judgment motion on July 2, 2021 (Filing No. 66 at 1). Between July 2, 2021, and September 13, 2021, when the Bewleys' response was ultimately filed, the Bewleys could have moved to serve additional discovery and obtain responses. The Court ruled on the Bewleys' discovery motion in a matter of days, and Defendants served responses the day after receiving the

requests. The Bewleys do not explain why they waited until October 1, 2021, to seek additional

discovery, or why they could not have done it sooner.[5]  An "equitable deviation" from Local Rule

56-1 is not warranted.

Further, the Court would not be overlooking a "mere technicality" by admitting the cauda

equina syndrome evidence. Before October 1, 2021, Defendants had no reason to think the

Bewleys would consider that information material on summary judgment. Defendants also had no

ability to review or prepare a rebuttal to the Acta Veterinaria Brno Article before the Bewleys filed

their Motion for Leave to File Surreply. For these reasons, the Bewleys' Motion for Leave to File

Surreply is **denied in part** for purposes of offering argument or evidence regarding cauda equina

syndrome (Filing No. 74-1 at 13–15; (Filing No. 74-6; Filing No. 74-7; Filing No. 74-8).

### B.        Admissibility of the IndyStar Article and Mr. Brandau's Reports

In their Response, the Bewleys designate the IndyStar Article, which analyzes the

Indianapolis Metropolitan Police Department's ("IMPD") police dog training and bite incidents

(Filing No. 62-4), and two expert reports prepared by Mr. Brandau dated June 29, 2021, and

August 30, 2021 (together, the "Brandau Reports").  Defendants argue that the IndyStar Article is

inadmissible hearsay, contains inadmissible hearsay, and is irrelevant and immaterial.[6]  (Filing No.

73 at 1–2.)  Defendants also argue that the Brandau Reports are inadmissible because they are

unsworn and unreliable, citing Mr. Brandau's lack of qualifications and reliable methodology.  *Id.*

at 2–11.  For the reasons discussed below, the Court concludes the IndyStar Article is inadmissible

---

[5] The Court notes that the Bewleys have previously stated that they attempted to obtain this information "informally" (Filing No. 66 at 2) via email on August 27, 2021 (to "resolve an office dispute") (Filing No. 67-1), and verbally during a break in Mr. Brandau's deposition on October 1, 2021 (Filing No. 67 at 3, ¶ 11), but these requests still do not show why the Bewleys did not seek leave to conduct additional formal discovery between July 2, 2021, and September 13, 2021.

[6] Evidence need not be material to be admissible on summary judgment, so the Court construes Defendants' immateriality objection as an irrelevance objection.

but that the Brandau Reports, except for the portions that discuss or rely on inadmissible news articles, are admissible.

### 1.     **The IndyStar Article**

The Bewleys concede that the IndyStar Article is hearsay, but they contend it falls within the residual exception to the hearsay rule under Federal Rule of Evidence 807.  The Bewleys bear the burden of proving this exception applies.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987) (holding that the proponent of hearsay evidence must prove to the court, by a preponderance of the evidence, that the Rules of Evidence have been satisfied)); *Lockwood v. v. McMillan*, 237 F. Supp. 3d 840, 847 (S.D. Ind. 2017).

Federal Rule of Evidence 807 provides that a hearsay statement not otherwise admissible under Federal Rules of Evidence 803 or 804 may be admissible if:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid 807.[7]  Courts only sparingly apply the residual hearsay exception. As the Seventh Circuit has explained, "[i]n applying this rule, we have heeded congressional guidance to construe 'these conditions narrowly' so that the residual exception does not swallow the rule against hearsay." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 583 (7th Cir. 2019) (quoting *United States v. Sinclair*, 74 F.3d 753, 759 (7th Cir. 1996) (interpreting the predecessor to Federal Rule of Evidence 807)).

---

[7] The Bewleys' surreply brief recites an old version of Federal Rule of Evidence 807, which was amended in 2019 (Filing No. 74-1 at 2).

In addressing the exception's first requirement—trustworthiness—the Court must consider all "circumstantial guarantees surrounding the making of the statement itself, as well as any independent evidence corroborating the statement." Fed. R. Evid. 807, advisory committee's note to 2019 amendment.  The Court may consider only the guarantees of trustworthiness that existed at the time of the statement "and do not include those that may be added by using hindsight." *Huff v. White Motor Corp.*, 609 F.2d 286, 292 (7th Cir. 1979).  Courts regularly consider certain factors in determining trustworthiness: the declarant's motivation to speak truthfully; the spontaneity of the statement; the lapse of time between the event and the statement; whether the statement was under oath; whether the declarant was subject to cross-examination; the relationship between the declarant and the person to whom the statement was made; whether the declarant had demonstrable firsthand knowledge; the declarant's consistency across multiple statements; whether the statement was elicited by leading questions; and whether the statement was recorded.  2 Kenneth S. Broun, et al., McCormick on Evid. § 324, at 563 –565 (7th ed. 2013).

The first factor weighs in the Bewleys' favor; the IndyStar Article's authors were likely motivated by journalistic integrity to truthfully report their findings. However, the remaining factors either weigh heavily against a finding of truthfulness or cannot be assessed on the present record.  The IndyStar Article's statements were not spontaneous or made shortly after the described events—they were made after a "yearlong investigation" of records dating back to 2017.  (Filing No. 74-1 at 4.)  The statements were not made under oath or via affidavit, and the authors were not subject to any type of cross-examination.  The authors and their sources had no identifiable relationship.  And, importantly, the authors had no personal knowledge of the information (the IMPD training policies and police dog bites) they reported.  Neither the IndyStar article nor the record on summary judgment contains sufficient information to determine whether the authors'

statements were consistent across other statements, whether the reported statements were elicited by leading questions, or whether the reported statements were recorded.  Based on these factors, the IndyStar Article is not trustworthy.

The Bewleys argue the IndyStar article is trustworthy because it was part of a larger story published by several organizations that are "well-known nationwide and respected by peers," because the "the Article was precipitated by a yearlong investigation into the Indianapolis police dogs," and because "some of the statements contained in the Article are from Craig Patton, the expert retained by the Defendants" (Filing No. 74-1 at 3).  None of these arguments are persuasive.

The trustworthiness of the organizations that published the IndyStar Article is not a proper consideration.  In applying Federal Rule of Evidence 807, "[t]he credibility of the witness relating the statement is not a part of [the trustworthiness] inquiry."  Fed. R. Evid. 807, advisory committee's notes to 2019 amendments.  The length of the authors' investigation weighs against its trustworthiness, as discussed in the multi-factor analysis above.  And regardless of Craig Patton's trustworthiness, his statements themselves are inadmissible hearsay.

The Bewleys do not address Defendants' argument that the IndyStar Article is inadmissible because it contains inadmissible hearsay (Filing No. 73 at 2). Federal Rule of Evidence 805 provides that a hearsay statement containing hearsay is admissible only if "each part of the combined statements conforms with an exception to the rule."  The IndyStar Article consists of an analysis of verbal and written statements by an unknown number of declarants, none of whom are identified in the IndyStar Article.  Even if the IndyStar Article satisfied the requirements of Rule 807, it would still be inadmissible because the Bewleys do not show that each hearsay statement in the IndyStar Article conforms to a hearsay exception.

Other federal courts have found that similar reports constitute inadmissible hearsay that do not satisfy Federal Rule of Evidence 807. *See, e.g.*, *Bernard v. E. Stroudsburg Univ.*, 700 Fed. Appx. 159, 167 (3d Cir. 2017), *cert denied*, 138 S. Ct. 1002 (mem.) (finding investigative report prepared by outside law firm untrustworthy because it was not finalized and "replete with hearsay-within-hearsay," also noting that quality of investigators and unbiased inclusion of hearsay in report did not resolve untrustworthiness or admissibility issues); *Mood v. County of Orange*, No. 17-cv-00762, 2019 WL 13036027, at *2–5, 7–8 (C.D. Cal. July 25, 2019) (finding a news article describing a pattern of injuries like the kind suffered by plaintiff untrustworthy and inadmissible because plaintiff had not tried to obtain sworn testimony from article's author and because article contained inadmissible hearsay).

The Bewleys' arguments as to the second element of Federal Rule of Evidence 807—that the IndyStar Article is more probative on the point for which it is offered than any other evidence that the Bewleys can obtain through reasonable efforts—are well taken. The Bewleys offer the IndyStar Article to show that Speedway engaged in a "pattern of deliberate indifference" by having its only police dog trained by IMPD, whose police dogs (according to the IndyStar Article) bite a disproportionately large number of people (Filing No. 63 at 20–23; Filing No. 74-1 at 3). The Court agrees that the Bewleys likely could not reasonably obtain evidence as or more probative on that point than the IndyStar Article, which was the culmination of a lengthy, extensive investigation by several organizations (Filing No. 74-1 at 3–4). However, the IndyStar Article's lack of trustworthiness leaves the residual hearsay exception inapplicable.

The Court also agrees with the Bewleys that the IndyStar Article would be relevant if admissible, as it would relate to whether Speedway showed deliberate indifference by delegating

its police dog training to IMPD.  But despite its relevance, the IndyStar Article constitutes and contains hearsay to which no exception applies.

The IndyStar Article is inadmissible for purposes of summary judgment and will not be considered by the Court. [8]

### 2.    **The Brandau Reports**

Defendants also contend the Brandau Reports are inadmissible because they are unsworn and because they are unreliable, citing Mr. Brandau's lack of expert qualifications and unreliable methodology.  Because the Court has granted the Bewleys leave to submit Mr. Brandau's belated affidavit, resolving Defendants' first objection, the Court will now address Defendants' reliability arguments.

Federal Rule of Evidence 702 governs testimony of expert witnesses.  "Under the *Daubert* gatekeeping requirement, the district court has a duty to ensure that expert testimony offered under Federal Rule of Evidence 702 is both relevant and reliable." *Jenkins v. Bartlett*, 487 F.3d 482, 488–89 (7th Cir. 2007) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). "Whether proposed expert testimony is sufficiently reliable under Rule 702 is dependent upon the facts and circumstances of the particular case." *Id.* at 489. The Court is given "latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citing *Jenkins*, 487 F.3d at 489).  "In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine

---

[8] Although another judge of this Court considered the IndyStar Article on summary judgment in another matter, *Mitchum v. City of Indianapolis*¸ No. 19-cv-02277, "'a decision of a federal district court judge is not binding precedent . . . even upon the same judge in a difference case.'" *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed. 2011)).  Further, the Court cannot determine based on the record in this case whether any objections were raised to the IndyStar Article's admissibility in *Mitchum*, or whether any exceptions to the rule against hearsay might have applied in *Mitchum*.

the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215

F.3d 713, 718 (7th Cir. 2000) (citing *Kumho Tire Co.*, 526 U.S. at 153).

      a.      <u>**Mr. Brandau's Qualifications**</u>

An expert may be qualified by "knowledge, skill, experience, training, or education." Fed.

R. Evid. 702.  Courts consider the entirety of an expert's practical and academic experience in

evaluating the expert's qualifications.  *Smith*, 215 F.3d at 718.

Mr. Brandau has been training dogs for forty-five years ([Filing No. 74-1](#)).  In that time, he

has become licensed as an animal control officer, and he has received a variety of certifications

from a number of animal organizations from several states between 1981 and 2010 ([Filing No. 70-

1](#)).  He is an Evaluator for the American Kennel Club Canine Good Citizen Award and is a

Certified Veterinarian Technician ([Filing No. 74-4 at 2](#)).  He has trained police dogs and security

dogs, worked with several law enforcement agencies on dog training in the early to mid-1980,

including the Passaic County Park Police, the Morris County Sheriff's Department, and the Sussex

County Sheriff's Department, and founded and run his own company, Canine Companies, which

facilitates dog training programs ([Filing No. 74-1 at 9](#)).  Mr. Brandau has taught programs on dog

training in the United States and abroad.  *Id.* at 9.  He has also "personally trained and examined

thousands of dogs, and [is] very familiar, in particular, with Police K9s and their training and

German Shepherds and the Belgian Malinois."  ([Filing No. 74-4 at 2](#)).

Defendants argue that despite Mr. Brandau's breadth of experience, he is not qualified to

offer testimony as an expert on police dog training because he has not worked with law

enforcement agencies or trained police dogs for several decades, does not associate with police k-

90 training organizations or read police dog training publications, and relies on publications that he has had for several years, some of which might be outdated.[9]

Mr. Brandau's lack of recent work experience with law enforcement agencies does not bar him from qualifying as an expert. His earlier experience with law enforcement is only one part of his years of experience, training, and education in the field of canine behavior and training. Additionally, Federal Rule of Evidence 702 contains no recency requirements. Just as an expert's college or advanced degrees may be considered expert qualifications despite their age, so may Mr. Brandau's years of work with law enforcement.

Similarly, Mr. Brandau's reliance on older, potentially outdated materials does not negate his qualifications or make his testimony inadmissible. In determining admissibility of expert testimony, courts do not consider "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions." *Smith*, 215 F.3d at 718. Those considerations speak to the quality of the expert testimony, not its admissibility. Courts may consider only whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed." *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000). Defendants have offered no evidence that it was inappropriate for Mr. Brandau to rely on older or even outdated materials. They have, however, noted that Mr. Brandau does not feel the need to stay apprised of newer publications because he believes "the training of police K-9s has not changed since the 1980[s]" (Filing No. 73 at 4; *see* Filing No. 70-1 at 13 (Q: … "Why do you hold the opinion there's nothing that's changed?" A: "Because it hasn't. I'm in the industry. I'm experienced. I've been doing this for almost 45 years…. I know what [dog trainers] do. I know what's done. I know how it's done. Dogs are dogs. Training is training."). Although

---

[9] Defendants offer no evidence that any of the publications on which Mr. Brandau relied were in fact outdated.

Mr. Brandau's reliance on older materials is a relevant consideration concerning the quality of his opinion, but it does not disqualify him as an expert.

Lastly, Mr. Brandau's lack of membership with police dog training associations and lack of subscription to police publications does not devalue his years of experience with law enforcement and years training dogs. *See Jackson v. City of Bloomington*, No. 17-cv-1046, 2019 WL 202160 at *3 (C.D. Ill. Jan. 15, 2019) ("Mr. Papet's lack of membership in a police dog association likewise does not alter the breadth of his experience."). And his decision not to subscribe to or rely on police dog training publications again speaks to the quality of his testimony, not its admissibility. *See Walker*, 308 F.3d at 587.

The Court is persuaded that Mr. Brandau is qualified to offer the opinions about canine behavior and of the training and use of police dogs expressed in the Brandau Reports for purposes of summary judgment.

### b.      **Mr. Brandau's Methodology**

A court's reliability analysis does not end with a conclusion that an expert is qualified to testify about a given subject.  Next, a court must examine the expert's methodology in forming the expert's opinions. *Gayton*, 593 F.3d at 616. Courts regularly consider four factors in determining whether a methodology is reliable under *Daubert*: (1) whether the scientific theory has been or can be tested; (2) whether the theory has been subjected to peer-review and/or academic publication; (3) whether the theory has a known rate of error; and (4) whether the theory is generally accepted in the relevant scientific community. *C.W. ex rel. Wood v. Textron*, 807 F.3d 827, 835 (7th Cir. 2015); *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d a426, 431 (7th Cir. 2013) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993)). This list is not exhaustive, and reliability must be determined on a case-by-case basis. *Mitchum v. City of Indianapolis*, 534 F. Supp. 3d 1001, 1006 (S.D. Ind. 2021).

Defendants question Mr. Brandau's methodology due to his reliance on older and potentially outdated materials, perceived inconsistencies or errors in the Brandau Reports, and his reliance on newspaper articles. The Bewleys respond that any errors in the Brandau Reports were inadvertent and are not sufficient to "undermine the opinions and conclusions within Brandau's reports" (Filing No. 74-1 at 13).

The Court has already determined that Mr. Brandau's decision to rely on older materials speaks to the quality of his testimony, not its admissibility. Factual errors in the Brandau Reports again speak to the quality of Mr. Brandau's testimony. *See Simstad v. Scheub*, 2014 WL 6473264, at *2 (N.D. Ind. Nov. 18, 2014) (finding that modification of original expert report to correct mistakes identified during deposition did not make the report unreliable). Questions regarding the facts underlying the Brandau Reports are for the fact finder to resolve at trial, not the Court in determining admissibility. Defendants would be well within their rights to highlight any erroneous facts underlying Mr. Brandau's opinions at trial. However, these alleged errors and inconsistencies do not affect the Brandau Reports' admissibility, and Defendants have not cited any caselaw to the contrary (Filing No. 73 at 6–11).

Defendants' objections to Mr. Brandau's recitation of the IndyStar Article and an article published by Fox 59 (the "Fox 59 Article"), however, should be sustained. The Court has determined that the IndyStar Article is inadmissible hearsay. The Fox 59 Article is also for the same reasons. Federal Rule of Evidence 703 permits experts to rely on otherwise inadmissible evidence in forming opinions, but only if the underlying evidence is the kind that "experts in the particular field would reasonably rely on . . . in forming an opinion." Fed. R. Evid. 703. Mr. Brandau concedes in his deposition that he does not typically rely on news articles in forming his opinion (and has not done so before), and that he did not consider the articles in forming his

opinions, despite including them in his Reports (Filing No. 70-1 at 29, 36).  Accordingly, the

portions of the Brandau Reports restating or relying on the IndyStar Article or Fox 59 Article are

inadmissible for purposes of summary judgment.  The remaining portions of the Brandau Reports

are admissible for purposes of summary judgment and may be considered by the Court.

## C.    Federal and State Law Claims Against SPD

Defendants argue that SPD is not a suable entity, so all claims against it should be

dismissed (Filing No. 48 at 5).  The Bewleys concede that SPD is not a proper suable party (Filing

No. 63 at 9).  "The United States Supreme Court has instructed that local government liability

under § 1983 'is dependent on an analysis of state law.'" *Sow v. Fortville Police Dep't*, 636 F.3d

293, 300 (7th Cir. 2011) (quoting *McMillian v. Monroe Cnty.*, 520 U.S. 781, 786 (1997)).  Under

Indiana law, municipal police departments lack the capacity to sue or be sued. *Id.* (citing Ind. Code

§§ 36-1-2-10, -11, and -23).

This Court has consistently held that Section 1983 claims must be asserted against the

municipality and not the municipal police department.  *See, e.g.*, *Ware v. City of Indianapolis*, No.

21-cv-02244, 2021 WL 4895320, slip op. at 2 (S.D. Ind. Oct. 20, 2021) ("The law is clear that the

IMPD is not a suable entity."); *Wynn v. City of Indianapolis*, 496 F. Supp. 3d 1224, 1232-33 (S.D.

Ind. 2020) (concluding that the IMPD is not a suable entity for purpose of Section 1983 claim);

*Shirley v. IMPD SWAT*, No. 19-cv-04111, slip op. at 2 (S.D. Ind. June 8, 2020), *report and*

*recommendation adopted*, No. 19-cv-04111 (S.D. Ind. July 21, 2020) (concluding that "IMPD

SWAT" is not a suable entity and "[i]nstead, the City of Indianapolis is the proper suable entity

because Indiana law does not provide for municipal police departments to sue or to be sued");

*Perry v. Thomas*, No. 09-cv-1015, 2011 WL 693622, at *4 (S.D. Ind. Feb. 18, 2011) (concluding

that "[t]he IMPD is not a suable entity and thus not a proper party" to an action asserting claims

under Section 1983 and Indiana law, and that any claims against the IMPD or officers in their

official capacities "are necessarily asserted against the City of Indianapolis and are understood as such"); *Hodges v. Indianapolis Metro. Police Dep't*, No. 08-cv-08, 2009 WL 2044375, at *2 n.4 (S.D. Ind. July 9, 2009) ("The Defendants correctly point out that the IMPD is not a suable entity under Indiana law . . . . [T]he Court will consider the claims asserted against the IMPD as claims against the City.").

Accordingly, the Court **grants** summary judgment as to all claims against SPD.

**D.**     **Federal Claims Against Officer Turpin and Speedway**

In their Complaint, the Bewleys allege Defendants' conduct "violated Bewley's rights under 42 U.S.C. § 1983 and constituted excessive force (Filing No. 1-2 at 3, ¶ 15). Specifically, they allege that "defendants['] actions violated Bewley's right to be free from unreasonable search and seizure under the 4th amendment". *Id.* at 3, ¶ 15. Defendants move for summary judgment on the Bewleys' constitutional claims, focusing on only the Fourth Amendment claims expressly alleged in the Complaint, and arguing that Mr. Bewley was not "seized" under the meaning of the Fourth Amendment. In their Response, the Bewleys argue they had also asserted claims under the Fourteenth Amendment. In their Reply, Defendants contend the Bewleys are barred from asserting a Fourteenth Amendment claim but that such a claim would fail, like the Fourth Amendment claim, because Mr. Bewley was not seized.

For the following reasons, the Court finds that Mr. Bewley was seized under the Fourth Amendment, and that although the Bewleys' Complaint sufficiently alleged a Fourteenth Amendment claim, Officer Turpin's conduct did not rise to the level of a substantive due process violation.

**1.**     **Fourth Amendment Unreasonable Seizure Claims**

Defendants contend they are entitled to summary judgment on the Bewleys' Fourth Amendment claims because no Fourth Amendment "seizure" occurred. The Bewleys respond that

Mr. Bewley was "seized," and that the seizure was unreasonable.  The Court concludes that genuine disputes of material fact preclude summary judgment on the Bewleys' Fourth Amendment claims.

In disputing whether Mr. Bewley was "seized" under the Fourth Amendment, the parties primarily discuss two recent nonbinding, analogous cases—*Mancini v. City of Indianapolis*, No. 16-cv-02048, 2018 WL 4680188 (S.D. Ind. Sept. 28, 2018), and *Mitchum v. City of Indianapolis*, No. 19-cv-02277, 2021 WL 2915025 (S.D. Ind. July 12, 2021).  Both cases involved innocent bystanders who were bitten by police dogs in pursuit of a fleeing suspect.  In *Mancini*, the Court found no seizure occurred, and in *Mitchum*, the Court found a seizure did occur.

In *Mancini*, IMPD officer Greg Stewart ("Stewart") and his police dog, Scooter ("Scooter"), were called to a scene as backup after a suspect fled a traffic stop into an alley in a residential area. *Mancini*, 2018 WL 4680188, at *1. Stewart believed the fleeing suspect was armed and hiding somewhere in the alley. *Id.* Before deploying Scooter, Stewart made a loud announcement in English and Spanish that if the suspect did not surrender, he would deploy Scooter, and the suspect may be bitten. *Id.*  After receiving no response, Stewart went to his car and deployed Scooter on leash.  Scooter eventually led Stewart to the suspect.  Stewart instructed the suspect to show his hands, but the suspect fled over a fence. *Id.* Stewart again shouted a warning—"Stop, police, or I'll send the dog"—but the suspect continued to flee.  "Knowing that Scooter was 'locked onto' [the suspect] as the target of pursuit, Stewart dropped Scooter's leash and allowed Scooter to lead." *Id.* Scooter was not trained to bite the first person he came into contact with, but the Court noted that although dogs "can be targeted to pursue a particular suspect . . . they cannot be trained to differentiate between a guilty person and an innocent person a[s] dogs have no cognitive reasoning." *Id.*

25

The suspect then leapt over another fence into Ms. Mancini's front yard and ran into her backyard, where her dogs began barking. *Id.* Stewart heard Ms. Mancini's dog barking and unsuccessfully attempted to recall Scooter. Scooter pursued the suspect along the other side of Ms. Mancini's fence and eventually pushed through the fence into her backyard. Meanwhile, Ms. Mancini had gone outside to check on her dogs. Within seconds of Ms. Mancini leaving her home, Scooter jumped on and bit Ms. Mancini. *Id.* Ms. Mancini brought Section 1983 claims under the Fourth and Fourteenth Amendments.

The Court in *Mancini* granted summary judgment for defendants, finding no seizure occurred. The Court likened Ms. Mancini's claims to one of transferred intent, finding that "[t]he undisputed evidence is that Mancini was not the intended object of the officers' efforts to seizure the fleeing suspect," so Mancini was never "seized" under the meaning of the Fourth Amendment. *Id.* at 8.

In *Mitchum*, IMPD officers were searching for two carjacking suspects in a residential neighborhood. 2021 WL 2915025, at *1. IMPD officer Molly Groce ("Groce") and her police dog partner, Obi ("Obi"), were called to the scene. By the time they arrived, one of the suspects had been apprehended. Groce did not believe the remaining suspect was armed. *Id.* Groce informed her fellow officers that Obi was "not social and needed space while tracking." *Id.* Groce gave a verbal announcement of her intent to deploy Obi and then deployed him on a six-foot leash, commanding him to track the fleeing suspect. *Id.* Obi instead began pulling Groce toward the first suspect and barking at him, so Groce instead commanded Obi to begin an area search." *Id.* Obi was trained to bite and hold the first person he encountered. *Id.* at *15.

Obi led Groce into Mr. Mitchum's side yard.[10]  Groce gave no verbal announcement upon entering Mr. Mitchum's yard.  Obi turned the corner onto Mr. Mitchum's back patio and bit Mr. Mitchum's left calf.  *Id.*  Officer Groce pulled Obi by his collar to release Mr. Mitchum, but after releasing Mr. Mitchum's left calf, Obi bit down again on Mr. Mitchum's right foot.  *Id.* at *2.

The Court in *Mitchum* distinguished *Mancini*, finding that Mr. Mitchum was "seized" under the meaning of the Fourth Amendment.  The *Mitchum* court reasoned that because Groce commanded Obi to conduct an area search and subdue the first person he encountered, "the object of the force [was] no longer an identified subject, but that of any human being.  Mr. Mitchum's freedom to leave was eventually terminated by Groce's intentional deployment of Obi to "[search] in the area of Mr. Mitchum's backyard."  *Id.* at *4.  The Court noted that in *Mitchum*, unlike *Mancini* and other transferred intent cases, "there was no suspect being actively tracked or apprehended and there was no confusion for the canine as to which individual was proper to engage." *Id.* at *5. This Court is persuaded that after drawing all reasonable inferences in the Bewleys' favor, this case is more like *Mitchum* than *Mancini*.

The Fourth Amendment provides the right to be secure from unreasonable searches and seizures.  U.S. Cons. amend IV.  The Supreme Court has stated that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989) (emphasis in

---

[10] The parties in *Mitchum* dispute what happened next.  Because the decision in *Mitchum* cited by the parties was a summary judgment ruling, the Court is summarizing the facts in the light most favorable to the non-moving party, as the *Mitchum* court did.

original).  In determining whether means were *intentionally applied*, "it [is] enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599.  "In other words, "[a] seizure occurs when an *unintended* person or thing is the object of the detention or taking . . . but the detention or taking itself must be willful." *Id.* at 594.  *Brower* only requires that the seizure results from intentional actions, not accidental." *Mancini v. City of Indianapolis*, No. 16-cv-02048, 2017 WL 4250112, at * (S.D. Ind. Sept. 26, 2017) (citing *Brower*, 489 U.S. at 599).

Here, Officer Turpin intentionally set the instrumentality in motion that caused Mr. Bewley's seizure by releasing Tom from the patrol vehicle when Mr. Bewley was the closest and only person in Tom's view.  Thus, Tom intentionally seized Mr. Bewley.  Defendants offer affidavit testimony from Officer Turpin that Tom had been trained to focus on suspects he was commanded to pursue, had never previously bitten anyone, and was commanded to pursue the fleeing suspect and "locked-in on" the suspect once deployed (Filing No. 47-2 at 2–3). However, the record does not clarify whether or how Tom was trained to behave when deployed without a specific command and when the intended target is out of sight, which the Court must assume on summary judgment was the case here.  Officer Turpin also does not explain how he was able to perceive Tom "locking-in on" the intended suspect, and in light of Mr. Bewley's testimony that the suspect was out of sight and that Tom ran straight for him, it is reasonable to infer for purposes of summary judgment that Tom did not "lock in on" the intended suspect.

In response, the Bewleys offer evidence supporting a reasonable inference that Tom was not in dedicated pursuit of the fleeing suspect when he bit Mr. Bewley, and that he was deployed to pursue and apprehend the only person in the vicinity, which Officer Turpin mistakenly believed was the suspect.  Mr. Bewley testified in his deposition that he was in Officer Turpin and Tom's

plain view when Tom was deployed, that the suspect had fled out of view, and that Tom ran straight toward Mr. Bewley.  As this Court has recognized, dogs "cannot be trained to differentiate between a guilty person and an innocent person."  *Mancini*, 2018 WL 4680188, at *1.

This case is distinguishable from *Mancini* and other transferred intent cases.  This is not a case in which Tom had been correctly pursuing the intended suspect and Mr. Bewley unfortunately stumbled into Tom's path. Viewing the facts in the light most favorable to the Bewleys, Officer Turpin deployed Tom after Tom was unable to see the intended suspect and did not give Tom a specific command when deployed.  It is reasonable to infer that Tom was not in active pursuit of the fleeing suspect when he bit Mr. Bewley but was instead released to bite the first person he could, who was Mr. Bewley.  Under these facts, Mr. Bewley was seized under the meaning of the Fourth Amendment.

Defendants rely entirely on their argument that Mr. Bewley was not seized in moving for summary judgment on the Bewleys' Fourth Amendment claim, and they have offered no argument or evidence regarding the reasonableness of Mr. Bewley's seizure.  The Court finds that genuine disputes of material fact preclude a finding that Mr. Bewley's Fourth Amendment rights were not violated.

### 2.   Fourteenth Amendment Substantive Due Process Claim

In their Response, the Bewleys argue that Mr. Bewley's Fourth *and* Fourteenth Amendment rights were violated, (Filing No. 63 at 13, 15–16).  Defendants respond that the Bewleys failed to allege Fourteenth Amendment claims in their Complaint or in their Statement of Claims, (Filing No. 44), and they cannot now assert such claims, (Filing No. 73 at 14).

This Court recognizes the long-standing principle that "'a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment.'"  *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir.

2017) (quoting *Whitaker v. Milwaukee Cnty., Wis.*, 772 F.3d 803, 808 (7th Cir. 2014)); *Brooks v. City of Kankakee, Ill.*, 7 F.4th 649, 656 (7th Cir. 2021) (affirming dismissal of disparate impact claim asserted for first time in response to motion for summary judgment). This principle, however, only bars parties from asserting new factual allegations, not new legal theories supported by previously pleaded facts. *Colbert*, 851 F.3d at 656 ("It is factual allegations, not legal theories, that must be pleaded in a complaint." (Quotation marks omitted)).

Although the Bewleys did not expressly allege in their Complaint that Defendants violated Mr. Bewley's Fourteenth Amendment rights, their Complaint contains an adequate factual basis for a Fourteenth Amendment claim. The Bewleys allege conduct by Officer Turpin that they claim constituted excessive force against Mr. Bewley, depriving him of his constitutional rights (Filing No. 1-2 at 3). These facts are sufficient to support both Fourth and Fourteenth Amendment claims. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) ("It is true that the Fourth and Fourteenth Amendments provide a remedy when a citizen's property is unreasonably damaged during a search."). To be sure, in *Mancini*, the plaintiffs adequately pleaded Fourth and Fourteenth Amendment claims based on similar factual allegations. 2017 WL 4250112, at *1 ("They allege[d]: 'Defendant Officers acted under color of law in using excessive and unreasonable force against Ms. Mancini and her unborn child when they restrained their liberty by directing the IMPD canine onto the property of Plaintiffs intending to effect a seizure, knowing that the canine was specifically trained to violently seize anyone in the space in which he was deployed.'").

Moreover, the Court is not persuaded by the argument that the Bewleys waived any Fourteenth Amendment claims by not asserting them in their Statement of Claims (Filing No. 44). The Statement of Claims states that Mr. Bewley "alleges claims against the Defendants … under

the United States Constitution, Federal law, common law negligence, [and] deliberate indifference". *Id.* Fourteenth Amendment claims are within the scope of these stated claims.

The Due Process Clause of the Fourteenth Amendment prohibits the government from "depriv[ing] any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has placed a "heavy burden" on plaintiffs asserting Section 1983 claims based on the Fourteenth Amendment. *Steen Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). "[F]or half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Id.* (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). To successfully assert a Fourteenth Amendment claim, the plaintiff must show the defendant engaged in "deliberate action intended to harm another" that is 'unjustifiable by any government interest." *Id.* "The 'conscience-shocking' standard with its intent requirement is the correct standard for police chases—on foot or otherwise—under the Fourteenth Amendment." *Mancini*, 2017 WL 4250112, at *3; *see, e.g.*, *Lewis*, 523 U.S. at 853–54 ("Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for a due process liability in a pursuit case."); *Steen*, 486 F.3d at 1023; *Bean v. Ind. Univ.*, 855, F. Supp. 2d 857, 864 (S.D. Ind. 2012) (concluding on a motion to dismiss that complaint failed to adequately allege that officer "acted with malicious or sadistic intent" in case where officer injured plaintiff while pursuing fleeing suspect on foot).

Defendants made no argument regarding the reasonableness of Officer Turpin's conduct for Fourteenth Amendment purposes in their Reply, relying exclusively on their argument that the Bewleys either failed to assert or waived any Fourteenth Amendment claims (Filing No. 73 at 14–15). Nevertheless, the Bewleys' concessions in their Response show they cannot prevail on their Fourteenth Amendment claims.

The parties agree that Officer Turpin did not intend for Tom to apprehend Mr. Bewley and did not intentionally set out to harm Mr. Bewley with deliberate action (Filing No. 48 at 3). And the Bewleys clarify in their Response that Defendants had not "intended to set out to cause deliberate harm to Mr. Bewley and Mrs. Bewley" (Filing No. 63 at 13). Their Fourteenth Amendment claims are instead based on Officer Turpin's act of "simply opening a car door and engaging a violent weapon, namely Tom, off leash, without control, to go search without having any inclination if anyone is outside nearby, such as children playing, and no visual or scent connection to those being sought". *Id.* at 13–14. As this Court has previously held, "[t]he allegation that general knowledge that the police canine is trained to violently attack and could potentially harm someone is not sufficient to prove . . . intent to harm [the plaintiff] under a shocks-the-conscience standard." *Mancini*, 2017 WL 4250112, at *3. "A purpose to cause harm is an indispensable condition for imposing Fourteenth Amendment liability." *Mitchum*, 2021 WL 2915025, at *9 (finding no Fourteenth Amendment violation because "[i]t is undisputed that Mr. Mitchum was not a suspect in this case, and that IMPD did not intentionally set out to cause deliberate harm to him."); *see Bublitz v. Cottey*, 327 F.3d 485 (7th Cir. 2003) (finding that although defendants' conduct caused fleeing suspect's vehicle to collide with bystander-plaintiffs, "[b]ecause Mr. Bublitz does not seek to prove any intention or purpose on the part of defendants to cause harm to the Bublitz family during the course of the high-speed chase, he cannot show that what the officers did deprived him or his family of their Fourteenth Amendment rights.").

Even taking all disputed facts in this case in the light most favorable to the Bewleys, Officer Turpin did not exhibit any intent to harm Mr. Bewley, so his conduct did not rise to a level of conscience shocking. The Court therefore **grants** summary judgment as to the Bewleys' Fourteenth Amendment claims.

32

### E.   <u>Qualified Immunity</u>

Defendants argue Officer Turpin is entitled to qualified immunity from the Bewley's Section 1983 claims. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted). In determining whether qualified immunity applies, courts consider, "in the light most favorable to the party asserting the injury, [whether] the facts alleged show the officer's conduct violated a constitutional right," and "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

### 1.   <u>Violation of Constitutional Right</u>

The Court has determined that Mr. Bewley was seized under the meaning of the Fourth Amendment, so the Court must next determine whether, when viewing the facts in the light most favorable to the Bewleys, that seizure was unreasonable. The Court again notes that Defendants have not designated any evidence or made any argument regarding the reasonableness of Officer Turpin's actions, relying solely on their argument that Mr. Bewley was not seized under the Fourth Amendment.

Excessive force cases are analyzed under the Fourth Amendment's "objective reasonableness" standard, which "requires careful attention to the facts and circumstances of each particular case," including (a) the severity of the crime at issue, (b) whether the suspect posed an immediate threat to the safety of the officers or others, and (c) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 388, 396 (1989). When the use of force involves the use of a police dog, courts consider four additional factors: (d) whether the officer warned the subject that he would deploy the dog; (e) the degree of control the officer maintained over the dog; (f) whether the officer terminated the dog bite within

a reasonable amount of time; and (g) whether alternative tactics reasonably were available. *Becker v. City of Evansville*, No. 12-cv-182, 2015 WL 328895, at *6 (S.D. Ind. Jan. 26, 2015), *aff'd and remanded sub nom. Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016) (collecting cases).

While giving some deference to an officer's perceptions and judgments, the Court's reasonable inquiry "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97; *see Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) ("[T]he dispositive question is whether, in light of the facts and circumstances that confronted the officer ... [did] the officer behave[ ] in an objectively reasonable manner.").

The *Graham* factors weigh against a finding of reasonableness, At the time Officer Turpin deployed Tom, he had reason to believe that the fleeing suspect had been in possession of a stolen vehicle, which is a Level 6 felony—the lowest level under Indiana law. Officer Turpin had no reason to believe the suspect was armed. The concerned citizen who originally called about the "suspicious" individuals made no mention of weapons, and possession of a stolen vehicle is not inherently a violent crime. The suspect therefore did not pose an immediate threat to Officer Turpin or others. The suspect was, however, actively fleeing from Officer Turpin.

The additional factors related to the use of a police dog also weigh against Defendants. Viewing the evidence in the light most favorable to the Bewley's, Officer Turpin did not make any announcement warning the suspect or bystanders about his release of Tom. Officer Turpin also did not maintain much control over Tom, as evidenced by Tom's failure to heed Officer Turpin's commands to stop running toward Mr. Bewley and to release him. Officer Turpin physically removed Tom as soon as reasonably possible. But other tactics were available to Officer Turpin— namely, deploying Tom on leash. As argued by the Bewley's, Deploying Tom on leash would

34

have been particularly appropriate in this case because the suspect was out of sight by the time Tom was released from the patrol car, and because Officer Turpin was in a residential neighborhood and had not taken time to check for bystanders in the area. The Bewleys have offered expert testimony that Tom should have been deployed on leash and that a leash would have prevented Mr. Bewley's injuries ([Filing No. 74-7 at 4](#)).

The balancing factors, in total, lead to a finding that Officer Turpin's deployment of Tom off leash in a residential neighborhood in pursuit of a low-level, unarmed felony suspect, without warning, without the suspect in view, and without being able to recall Tom was unreasonable, constituting excessive force. Taking the facts in the light most favorable to the Bewleys, a reasonable jury could conclude that Mr. Bewleys' Fourth Amendment rights were violated.

### 2.    <u>Clearly Established Right</u>

"A right is 'clearly established' when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks omitted)). The difficulty in determining whether a right is clearly established is defining the right in question. *Becker*, 2015 WL 328895, at *21*; *see Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) ("Before we can determine if the law was clearly established, 'the right allegedly violated must be defined at the appropriate level of specificity.'" (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999))). "The Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality,' and the Seventh Circuit has long held that 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.'" *Volkman*, 736 F.3d at 1090 (citing *al-Kidd*, 563 U.S. at 742, and *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987)).

To determine whether Officer Turpin is entitled to qualified immunity, the Court must determine whether the law clearly established, as of March 1, 2019, that a police officer violates a Fourth Amendment right to be free from excessive force by deploying a police dog off leash that was trained to pursue a specific suspect and had consistently bitten only people the dog was directed to apprehend, without issuing a command,[11] in a residential neighborhood, without warning, and without checking for bystanders, in pursuit of a suspected low-level felon.

This Court will first look to see if the right has been clearly established by controlling precedent from the Supreme Court and Seventh Circuit Court of Appeals. *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000). If no controlling precedent exists, "we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)); *see also Ashcroft v. al-Kidd*, 536 U.S. 731, 742 (2011) (requiring a "robust consensus of cases of persuasive authority" (quotation marks omitted)).

Alternatively, in "rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases." *Jacobs*, 215 F.3d at 767. In those cases, "plaintiffs can demonstrate clearly established law by proving the defendant's conduct was 'so egregious and unreasonable that . . . no reasonable [official] could have thought he was acting lawfully.'" *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (quoting *Abbott v. Sangamon Cnty.*, 705 .3d 706, 724 (7th Cir. 2013)). Outrageous conduct "obviously will be

---

[11] Although the Brandau Reports contain factual assertions regarding Tom's failures in training, the documents relied on by Mr. Brandau showing those failures were not separately offered by the Bewleys in an admissible form. Accordingly, the Court will consider only Mr. Brandau's opinions, and not any otherwise inadmissible facts underlying his opinions. Fed. R. Evid. 105; Fed. R. Evid. 703.

unconstitutional." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009). "But even as to action less than an outrage, 'officials can still be on notice that their conduct violates established law . . . in novel factual circumstances.'" *Id.* at 377–78 (alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730 (2002)).

The Bewleys do not cite any controlling caselaw from the Supreme Court or Seventh Circuit Court of Appeals, and the Court cannot find any, so the Court will look to other cases to determine whether a "robust consensus" of cases would find Officer Turpin's conduct to be unreasonable and excessive.  The Court finds no such consensus.

The cases cited by the Bewleys, and other analogous cases nationwide, are distinguishable because those cases all involved the deployment of police dogs who were trained and deployed to bite the first person they encountered, or had previously bitten bystanders. In *Collins v. Schmidt*, a District of Minnesota officer deployed a police dog on a twenty-foot leash in an alley, without warning, to track two suspects.  326 F. Supp. 3d 733, 735–36 (D. Minn. 2018).  The *Collins* court held that the officer acted unreasonably because he "knew [the dog] was likely to bite the first person he encountered during the search for suspects; as such, [the officer] intended for [the dog] to seize the first person he encountered.  Moreover, the fact that [the officer] put [the dog] on a 20-foot lead ensured that he could do so with ease.".

In *Relf v. City of Troy*, the police dog was similarly conducting a search—not a targeted pursuit—when it bit a bystander.  169 A.D.3d 1223, 1223 (N.Y. S. Ct. App. Div. 2019).  Although the *Relf* court noted the general proposition that "innocent citizens should not be seized," it ultimately found that "[q]uestions remain regarding whether an objective officer would reasonably believe that [constitutional] rights were violated by [releasing a police dog] from her leash to conduct a search *despite having knowledge that she had previously bitten two innocent people.*"

*Id.* at 1225–26 (emphasis added).  The *Relf* case did not rule on the issue of reasonableness, but even if it had, the case would be distinguishable because the police dog had been commanded to conduct a search and had a history of biting innocent bystanders.

The Bewleys also purport to cite the nonbinding 2018 decision in the *Mitchum* case, but *Mitchum* was decided in 2021.  To the extent the Bewleys meant to cite the nonbinding 2018 *Mancini* decision, that case does not clearly establish Mr. Bewley's right both because canine officer Scooter was trained to bite the first person he came across and because the Court held that no seizure occurred.  Even if the Bewleys meant to refer to the pre-2019 decisions cited by the *Mitchum* court in finding that Mr. Mitchum's rights were clearly established, those cases also do not clearly establish Mr. Bewley's right. 2021 WL 2915025, at *12.

In *Tucket v. City of Lakewood*, the police dog was deployed to conduct a search of a wooded area for a suspect that police could not confirm was in the area when he bit a bystander.  No. 15-cv-05355, at *1, *4 (W.D. Wash. Oct. 14, 2016).  In *Vathekan v. Prince George's County*, the Fourth Circuit Court of Appeals held that officers acted unreasonably by failing to give a warning before releasing a police dog into a house that would search the house and bite whoever it found. 154 F.3d 173, 176, 178 (4th Cir. 1998).  And despite the Eighth Circuit's apparent holding that an officer's failure to warn before releasing a police dog is objectively unreasonable, no binding "precedent compels the conclusion that a verbal warning is mandatory in every case where a police dog is utilized." *Becker v. City of Evansville*, 2015 WL 328895, at *10 (collecting cases, including from the Seventh Circuit, excusing failures to warn); *see Szabla  v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389 (8th Cir. 2007).

Further, this case is not one of the "rare" cases in which the constitutional violation was "patently obvious."  *Jacobs*, 215 F.3d at 767. *Contra Hope v. Pelzer*, 536 U.S. 730, 745 (2002)

(noting the "obvious cruelty inherent" in placing a chained inmate on an outdoor hitching post in the sun for seven hours with no shirt, little water, and no bathroom breaks). Officer Turpin's conduct, though unreasonable, was not outrageous. Based on Tom's training and history of accurate apprehensions, and based on Officer Turpin's (incorrect) belief that the suspect was the only person in the immediate area, his use of Tom was not so egregious as to patently violate a constitutional right.

Caselaw existing as of March 1, 2019, did not clearly establish that an officer's deployment of a police dog trained to pursue a specific target and had done so without incident for several years, off leash, without specific command, without warning, and without checking for bystanders in a residential neighborhood, was unreasonable. Officer Turpin is entitled to qualified immunity, and the Court **grants** summary judgment as to all federal claims against Officer Turpin.

**F.    _Monell_ Liability**

"[A] municipality is not vicariously liable for the constitutional torts of its employees but is answerable only for the consequences of its policies." *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001) (citing *Monell*, 436 U.S. at 694 (1978)). This rule prevents municipalities from being held liable "'solely on the basis of the existence of an employer-employee relationship with a tortfeasor'" and stems from doubt that Congress intended to use the threat of liability "'to oblige municipalities to control the conduct of *others*.'" *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 478–79 (1986)).

To hold a municipality liable, the plaintiff must prove that the municipality's "*deliberate* conduct . . . was the 'moving force' behind the injury alleged," resulting in a "direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404 (emphasis in original). A plaintiff may satisfy this burden by proving that "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental

39

practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Altizer v. Retherford*, No. 14-cv-31, 2015 WL 3843668, at *4 (S.D. Ind. June 22, 2015) (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)).

The Bewleys allege Speedway is liable for Officer Turpin's conduct because it did not properly train and supervise Officer Turpin and did not enact appropriate rules and regulations regarding SPD's use of police dogs (Filing No. 1-2 at 3). Defendants argue that Speedway is not liable under *Monell* under either theory because Speedway did not act with deliberate indifference (Filing No. 48 at 12–13). The Court agrees with Defendants.

A plaintiff alleging a municipality's failure to adequately train its agents can prevail on a Section 1983 claim only when the failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference in this context can be established by showing that the municipality either "fail[ed] to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation" or "fail[ed] to provide further training after learning of a pattern of constitutional violations by the police." *Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 646 (7th Cir. 2003) (citations omitted).

A plaintiff alleging a constitution violation allowed by or arising from a facially constitutional policy must prove that the municipality enacted the policy "with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 406–07 (quoting *City of Canton*, 489 U.S. at 388). In other words, a municipality can be liable for "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees." *Id.* at 407. The Bewleys do not challenge the facial constitutionality of the SPD's

written police dog handling policies (the "SPD Canine Policies").  *See Roddy v. Canine Officer*, 293 F. Supp. 2d 906, 915 (S.D. Ind. 2003) (finding police policies permitting the use of police dogs facially constitutional) (citing *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1553 (11th Cir. 1989) ("To the extent that the policy authorizes police officers to use canine force against suspects who pose a threat to an arresting officer or to the community, the policy is clearly constitutional under the dictates of *Tennessee v. Garner*." (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)).

Further, "a plaintiff who can point to only a single unconstitutional application of a facially constitutional policy faces a steep climb . . . because such the plaintiff 'can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action—enacting the policy—'rather than from some other intervening cause.'" *Becker*, 2015 WL 328895, at *28 (quoting *City of Canton*, 489 U.S. at 408–409). But a plaintiff may still prevail if he proves that the policy was the "moving force" causing his injury. *See City of Canton*, 489 U.S. at 404–405.

Defendants deny that the SPD Canine Policies and training provided to Officer Turpin and Tom show "deliberate indifference," citing Tom's training and years of service (Filing No. 48 at 13). As stated in Officer Turpin's affidavit, Tom served as SPD's only police dog for six years before biting Mr. Bewley, and in that time, Tom did not once bite any person that Officer Turpin had not directed him to apprehend.  *Id.*  Defendants also note that when asked in interrogatories to identify evidence supporting his *Monell* claims, Mr. Bewley identified only the absence of SPD rules and regulations preventing the use of police dogs in residential neighborhoods and the fact that Tom bit him.  *Id.*

In their Response, the Bewleys argue Speedway showed deliberate indifference by not requiring quarterly certification of SPD's police dogs, by training and certifying its dogs with the IMPD, and by enforcing a policy prohibiting "trophy" photographs[12] (Filing No. 6 at 20).

The SPD Canine Policies require "patrol and narcotics detection recertification" annually through the IMPD and require the "canine and handler" to "maintain the standards set forth and established in the basic training" and requires the handlers to "conduct periodic retraining programs." (Filing No. 47-2 at 13.)  The Bewleys offer expert testimony that Speedway fell below canine law enforcement standards by not requiring Tom's recertification quarterly, and that quarterly re-certification might have identified issues with Tom's ability to follow commands and prevented Mr. Bewley's injuries.  (Filing No. 74-4 at 5.)  However, this testimony does not convince the Court that Speedway acted with deliberate indifference in light of Tom's six years of service without any inadvertent bites (Filing No. 48 at 13). The Bewleys do not identify "a recurring situation that presents an obvious potential for a constitutional violation" or a "pattern of constitutional violations" that would have warranted revisions to the frequency of Tom's training and certifications. *Dunn*, 347 F.3d at 646.

Additionally, the incident with Mr. Bewley was the only unconstitutional application of the SPD Canine Policies,[13] and Mr. Brandau's report does not tend to show that SPD Animal Policies' annual certification requirement (or, more specifically, lack of a quarterly requirement) was the "moving force" behind the violation of Mr. Bewley's rights.  To the contrary, Mr. Brandau

---

12 The SPD Canine Policies indicate that "trophy" photographs are photographs taken by SPD officers of dog bites displayed for unofficial purposes (Filing No. 47-2 at 8).

13 The Bewleys describe a pattern of IMPD police dogs biting people in disproportionately high numbers and argue that because Speedway chose to have Tom trained by IMPD, the incident between Tom and Mr. Bewley should be considered one incident in a long pattern of IMPD dog bite incidents (Filing No. 73 at 20–23). However, in making this argument, the Bewleys rely entirely on the IndyStar Article or the portions of the Brandau Reports incorporating the IndyStar Article or Fox 59 Article, all of which is inadmissible, so this argument is therefore entirely unsupported.

identifies Officer Turpin's mishandling of Tom and Officer Turpin's violations of the SPD Canine Policies as the proximate cause of the violation (Filing No. 74-4 at 4 ("Officer Turpin's decision to deploy PSD Tom off leash is a direct and proximate cause of the injuries sustained by the Plaintiff."); Filing No. 70-1 at 40).  The Bewleys have not created a genuine dispute of material fact as to Speedway's deliberate indifference by failing to require Tom's quarterly recertification.

The Bewleys also have not shown a genuine issue of material fact by pointing to Speedway's decision to have Tom trained by the IMPD. The Bewleys' designated evidence discussing IMPD's training program or its faults is all inadmissible, so their arguments regarding the IMPD are without support.

The Bewleys lastly offer expert testimony that SPD's policy prohibiting "trophy" photographs shows Defendants emphasized "canine aggression and biting" and downplayed the importance of civilian rights and safety (Filing No. 74-4 at 6).  In response, Defendants claim this opinion is "illogical" and can lead to no reasonable inferences (Filing No. 73 at 17).  Whether this opinion is persuasive is not for the Court to decide.  However, the Bewleys again have not offered any admissible evidence showing that the "trophy" photographs policy was the "moving force" behind Mr. Bewley's seizure.

The Bewleys have not shown a genuine issue of material fact that would preclude judgment as a matter of law on their *Monell* claims.  The Court therefore **grants** summary judgment as to all federal claims against Speedway.

## G.    State Law Claims Against Officer Turpin and Speedway

The Bewleys' negligence claims are rooted in Indiana law.  Because they were joined with their Section 1983 claims, the Court exercised supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367. The Section 1983 claims have been dismissed, so the Court must determine whether it is appropriate to continue to exercise supplemental jurisdiction over the state law claims.

The Court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

"Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Sharp Elecs. v. Metro. Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) (citation and quotation marks omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation omitted). The Court finds that the third exception applies to the state law claims against Officer Turpin personally but that none of the exceptions applies to the state law claims against Speedway.

### 1.   State Law Claims Against Officer Turpin Personally

Defendants argue that the Bewleys' Complaint fails to assert that Officer Turpin's alleged acts or omissions were: (1) criminal; (2) clearly outside the scope of his employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit him personally, as required by Indiana Code § 34-13-3-5(c) (Filing No. 48 at 9–10). The Bewleys do not contend that Officer

Turpin acted criminally, outside the scope of his employment, maliciously, or to benefit himself in either their Complaint or on summary judgment (Filing No. 1-2; Filing No. 63).

In their Response, though, the Bewleys argue Officer Turpin's actions were willful and wanton, as shown by evidence designated on summary judgment (Filing No. 63 at 18). However, the Court finds no support for these arguments in the Complaint (Filing No. 1-2). The Complaint alleges Officer Turpin's actions constituted excessive force and that the dog bite was caused by Officer Turpin's "negligence and/or fault," but these allegations do not sufficiently allege willful and wanton conduct or provide a reasonable factual basis supporting allegations of willful and wanton conduct. *Id.* *See* Ind. Code § 34-13-3-5(c); *Carter v. Chicago Police Officers*, 165 F.3d 1071 (7th Cir. 1998) ("While a defendant's conduct may be both 'unreasonable' and 'willful and wanton,' these words are not interchangeable. Indeed, although a litigant could soundly argue that willful and wanton conduct should be considered unreasonable, the inverse is not necessarily true. It is entirely possible that unreasonable conduct may not rise to the level of willful and wanton conduct.").

It is absolutely clear that the Bewleys fail to state a claim against Officer Turpin individually under Indiana Code § 34-13-3-5(c), so the Court retains supplemental jurisdiction over those claims and **grants** summary judgment as to all state law claims against Officer Turpin personally.

### 2.    State Law Claims Against Speedway

The Court finds no reason to deviate from its standard practice of relinquishing supplemental jurisdiction with respect to the state law claims against Speedway. The statute of limitations will not have run on Mr. Bewley's state law claims, U.S.C. § 1367(d), and the Court has not expended substantial resources on the state law claims. Additionally, comity always favors allowing state courts to decide issues of state law.

Defendants argue that the Bewleys' state law claims "obviously fail" because Indiana Code § 34-13-3-3(a)(8) immunizes Defendants (Filing No. 48 at 14 (citing *Van Harken v. City of Chicago*, 672 F.3d 476, 478 (7th Cir. 2012)). Indiana Code § 34-13-3-3(a)(8) provides that governmental entities and their employees are not liable for any loss resulting from the adoption and enforcement, or failure to adopt or enforce, a law, rule, or regulation, unless the enforcement at issue "constitutes false arrest or false imprisonment."   Ind. Code § 34-13-3-3(a)(8).   The Bewleys rely on the exception for false arrest or false imprisonment (Filing No. 63 at 27). On reply, Defendants note that the Bewleys did not allege claims of false arrest or false imprisonment and that the factual allegations can be construed to allege only negligence claims, not intentional torts (Filing No. 73 at 18–19).

The ITCA does not immunize Defendants, although not for the reason asserted by the Bewleys. The Seventh Circuit recently explained "[t]he Indiana Supreme Court has held that because the Indiana Code limits police officers to using only the force that is reasonable to effectuate an arrest, an officer's use of excessive or unreasonable force is not shielded from liability or subject to immunity under the Indiana Tort Claims Act." *Gupta v. Melloh*, 19 F.4th 990, 1002 (7th Cir. 2021) (citing *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010) ("[T]he [Indiana] legislature intended that a governmental entity be immune only for failing to . . . enforce a law that falls within the scope of the entity's purpose or operational power. . . .") (omission in original) (quotation marks and citation omitted)); *see also Todero v. Blackwell*, 383 F. Supp. 3d 826, 842 (S.D. Ind. 2019) (citing *Wilson*, 929 N.E.2d at 203) (finding that excessive use of force against plaintiff during arrest precluded application of immunity under ITCA and denying summary judgment on state law tort claims against city).

It is not "absolutely clear" that the Bewleys failed to sufficiently plead their state law claims against Speedway under Indiana Code § 34-13-3-5 (Filing No. 48 at 9–10); *see Davis*, 534 F.3d at 654. That decision should be entrusted to an Indiana state court.

For these reasons, summary judgment is **denied** as to the state law claims against Speedway. The Court relinquishes its supplemental jurisdiction as to the remaining state law claims against Speedway and **remands** those claims to the state court.

## IV.    CONCLUSION

For the reasons discussed above, the Bewleys' Motion for Leave to File Surreply and Supplemental Designation of Evidence (Filing No. 74) is **GRANTED in part and DENIED in part**. Defendants' Motion for Summary Judgment (Filing No. 46) is **GRANTED in part** and **DENIED in part**. Summary judgment is **granted** as to all federal and state law claims against the Speedway Police Department, all federal and state law claims against Matthew Turpin personally, and all federal claims against the Town of Speedway, and those claims are **DISMISSED**. Defendants' Motion for Summary Judgment is **denied** as to the remaining state law claims against the Town of Speedway, which are **REMANDED** to the Marion Superior Court.

**SO ORDERED**.

Date:    6/27/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Robert V. Clutter
TAYLOR, CHADD, MINNETTE, SCHNEIDER & CLUTTER, P.C.
bclutter@tcmsclaw.com

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS DUNCAN & MERCHANT, LLP
ard@rkblegalgroup.com

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS DUNCAN & MERCHANT, LLP
jfk@rkblegalgroup.com

Edward J. Merchant
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS DUNCAN & MERCHANT, LLP
ejm@rkblegalgroup.com

Katherine Anne Piscione
Waldron Tate Bowen Funk Spandau LLC
katie@wtbfs-law.com

Pamela G. Schneeman
STEPHENSON MOROW & SEMLER
pschneeman@stephlaw.com

Jess M. Smith, III
TOM SCOTT & ASSOCIATES, PC
bcrowe@tomscottlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Brandon Eric Tate
WALDRON TATE BOWEN FUNK SPANDAU LLC
brandon@wtbfs-law.com

Stacy J. Vasilak
QUERREY & HARROW
svasilak@querrey.com

Ann Marie Waldron
WALDRON TATE BOWEN FUNK SPANDAU LLC
annmarie@wtbfs-law.com


Marion Superior Court